**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | § | |
| | § | |
| BIGLER LP; | § | Case No. 09-38188 |
| BIGLER LAND, LLC; | § | Case No. 09-38189 |
| BIGLER PETROCHEMICAL, LP; | § | Case No. 09-38190 |
| BIGLER PLANT SERVICES, LP; | § | Case No. 09-38192 |
| BIGLER TERMINALS, LP | § | Case No. 09-38194 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | |
| | § | Jointly Administered Under |
| | § | Case No. 09-38188 |

**DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 363 AND 364 FOR INTERIM AND FINAL ORDERS  (I) AUTHORIZING AND APPROVING THE DEBTORS' USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; (III) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION FINANCING, AND (B) GRANT SENIOR LIENS, JUNIOR LIENS, AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING <u>RELATED RELIEF</u>**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 23, 2009 AT 2:30 PM IN COURTROOM 600, U.S. BANKRUPTCY COURT, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.  IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-THREE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Bigler LP, Bigler Land, LLC, Bigler Petrochemical, LP, Bigler Plant Services, LP, and Bigler Terminals, LP, each a debtor-in-possession (collectively, the "<u>Debtors</u>"), hereby move this Court (the "<u>Motion</u>") on an emergency basis for Interim and Final Orders (I) Authorizing

and Approving the Debtors' Use of Cash Collateral; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Authorizing Debtors to (A) Obtain Post-Petition Financing; and (B) Grant Senior Liens, Junior Liens, and Superpriority Administrative Expense Status; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief.  In support of this Motion, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED[1]

By this Motion, the Debtors seek interim and final orders authorizing the Debtors to use cash collateral and granting adequate protection to the Pre-Petition Lenders.  The Debtors also seek interim and final orders authorizing the Debtors to obtain post-petition financing, scheduling a final hearing and granting related relief.  In particular, the Debtors seek authority, on an interim and final basis, to obtain post-petition financing in the aggregate amount of up to $10,000,000 (the "DIP Facility"), subject to the terms and conditions of the Debtor-in-Possession Credit Agreement between the Debtors and Amegy ("DIP Credit Agreement" and collectively with all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Documents").  In accordance with Bankruptcy Rule 4001, below is a summary of the terms of the proposed DIP Facility and the Debtors' use of cash collateral:[2]

    (a)    Borrower:   Debtors   and   certain   of   their   non-debtor   affiliates ("Borrowers")

    (b)    Guarantors:  Each Borrower and each Debtor

    (c)    Lender: Amegy Bank National Association ("Amegy" or "DIP Lender")

---

[1] Capitalized terms not defined herein are defined later in the Motion or in the DIP Documents.

[2] This summary is qualified in its entirety by reference to the provisions of the DIP Documents.  The Debtors will file the DIP Credit Agreement with the Court prior to the hearing on the Final Motion.  To the extent of any discrepancy among this summary, any term sheet or the DIP Credit Agreement provided at or before the hearing, the terms of the DIP Credit Agreement shall govern and control.

(d)    <u>Commitment and Availability</u>.  The DIP Credit Agreement shall provide for a total lending commitment of $10,000,000.

(e)    <u>Maturity Date</u>:  Six months from the date of approval.  The DIP Credit Agreement shall provide for certain additional terms related to events of default and shall include certain milestones related to the maturity of the DIP Facility.

(f)    <u>Purpose</u>:  The DIP Facility shall be used to (i) ensure that the Debtors have sufficient working capital and liquidity to permit the orderly continuation of their businesses, including but not limited to making payroll and preserving the going concern value of the Debtors' assets; and (ii) pay the administrative costs of these cases.

(g)    <u>Priority and Liens</u>:  All of the DIP Liens and the super-priority status provided below shall be subject to the Carve-Out (as defined below), and shall be provided as security for the full and timely payment of all of the obligations arising pursuant to the DIP Facility (the "<u>DIP Obligations</u>").  The DIP Lender will be granted security interests and liens in and upon substantially all of the Debtors' assets, whether such property was owned on the date the Debtors filed their bankruptcy petitions ("<u>Petition Date</u>") or thereafter created, but not including avoidance claims under sections 544, 545, 547, 548, 550 552(b) and 553 of the Bankruptcy Code (collectively, the "<u>DIP Collateral</u>"), as follows: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, first priority security interests in and liens on all DIP Collateral that is not otherwise subject to liens; (ii) pursuant to 364(c)(3) of the Bankruptcy Code, junior security interests in and liens on all DIP Collateral that is subject to liens; (iii) pursuant to 364(d)(1) of the Bankruptcy Code, first priority senior priming security interests in and liens on all DIP Collateral (collectively with (i) and (ii), the "<u>DIP Liens</u>") and (iv) pursuant to section 364(c)(1) of the Bankruptcy Code, a super-priority administrative expense claim against each Debtor and its respective estate.

(h)    <u>Use of Cash Collateral</u>:  Amegy, as administrative and collateral agent under the Debtors' pre-petition secured credit facilities (the "<u>Pre-Petition Agent</u>"), consents to the interim use of Cash Collateral (as defined by Bankruptcy Code section 363(a)), until the earliest to occur of (i) December 10, 2009, unless the Court enters a final order approving the use of Cash Collateral that is acceptable to the Pre-Petition Agent, (ii) the third business day following delivery of written notice of failure to comply with the terms of the interim order granting this Motion ("<u>Interim Order</u>"); (iii) the dismissal or conversion to chapter 7 of the Debtors' bankruptcy cases,  (iv) any stay, reversal, vacatur, rescission or other modification of the terms of the Interim Order not consented to by the Pre-Petition Agent, or (v) any Event of Default (as defined in the DIP Documents or the Interim Order) occurs and required notices have been given to cause the DIP Obligations to become due and payable.

(i)    <u>Adequate Protection</u>:  The Pre-Petition Agent and the Debtors' pre-petition lenders ("<u>Pre-Petition Lenders</u>") shall receive, only to the extent that there is a diminution in the value of their interest in the Pre-Petition Collateral: (i)  replacement liens in and upon substantially all of the assets of the Debtors, subject only to (x) the

Carve-Out, (y) the DIP Liens and (z) any valid perfected, enforceable and unavoidable liens existing as of the Petition Date and certain other liens which are permitted to exist under the Debtors' pre-petition credit facilities, as adequate protection for the use of Cash Collateral and (ii) a superpriority claim having priority over all administrative expenses, subject and subordinate only to the Carve-Out, claims under the DIP Facility, and any recoveries from avoidance actions ("Avoidance Actions").  The Pre-Petition Lenders also reserve, but are not granted, the right to assert claims for payment of additional interest at default rates.  All other creditors with perfected and enforceable pre-petition security interests are adequately protected based on the Debtors' proposed use of the DIP Facility to maintain the value of the Debtors' assets and avoid liquidation.

(j)      Carve-Out: Proceeds from the DIP Facility will be subject to a Carve-Out for amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court (the "Statutory Fees") and for allowed fees and expenses of attorneys, accountants, financial advisors and other professionals retained in these Cases by the Debtors and by any committee of unsecured creditors ("Committee") pursuant to section 327 or 1103 of the Bankruptcy Code (the "Case Professionals").

(k)      Interest: LIBOR plus 7.5%, with a LIBOR floor of 2.5%

(l)      Borrowing Conditions:  The DIP Credit Agreement will provide usual and customary terms.

(m)     Events of Default:  The DIP Credit Agreement will provide usual and customary terms, including certain milestones related to the maturity of the DIP Facility.

(n)      Fees and Expenses:  2.5% front-end fee, and 2.5% back-end fee

(o)      Indemnification:   The DIP Credit Agreement will provide usual and customary terms.

(p)      Waiver of Applicability of Nonbankruptcy Law Relating to Perfection on Property of the Estate or on the Foreclosure or Other Enforcement of the Lien:  The DIP Credit Agreement will provide usual and customary terms.

(q)      Relief From Automatic Stay:  The DIP Credit Agreement will provide usual and customary terms, including the right to assert rights to the DIP Collateral upon three (3) business days following the Termination Date of the DIP Facility.

(r)      Waiver of Section 506(c) Surcharge:  The Motion proposes to include in the Final Order a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code.

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

2.       On October 30, 2009, the Debtors filed voluntary petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

3.       The Debtors have continued in possession of their properties and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

4.       The Debtors and their affiliates are engaged in a variety of operations within the chemical, petrochemical, and marine terminals industries.   The Debtors currently have approximately 70 employees.  The Debtors' corporate headquarters are located at 1920 N. Memorial Way, Suite 201, Houston, Texas 77007.

5.       The Debtors' assets consist of a refined products storage facility, a petrochemical processing facility, 271 acres of land located on the Houston Ship Chanel, equipment, pipeline, storage tanks, and intangible assets including environmental permits and emissions credits, licensing agreements, and other engineering intellectual property.

## PRE-PETITION FUNDING OF THE DEBTORS' OPERATIONS

6.      Prior to the Petition Date, the working capital needs of the Debtors were met primarily by a senior secured term loan and a revolving credit facility provided by the Pre-Petition Lenders, pursuant to the terms and conditions of the Amended and Restated Credit Agreement dated April 17, 2008 (the "Pre-Petition Credit Agreement"), and the Loan Agreement dated May 18, 2007 together with all extensions, renewals and modifications thereto (the "Pre-Petition Loan Agreement"), and related agreements, notes, security agreements, instruments, and other documents executed in connection therewith (collectively, the "Pre-Petition Loan Documents").  The Pre-Petition Loan Documents include various affirmative and negative covenants customary for this type of financing, including, but not limited to, financial covenants related to a minimum debt service coverage ratio, a maximum ratio of total liabilities to tangible net worth ratio, a minimum tangible net worth, a minimum current ratio, and a maximum speculative inventory.  Negative covenants restrict the Debtors' ability to, among other things, incur additional indebtedness, incur liens, and make certain investments.

7.      The Pre-Petition Credit Agreement included a $60 million term loan credit facility, comprised of a $40 million tranche and a $20 million tranche.  As of the Petition Date, the balance of the Pre-Petition Credit Agreement was approximately $57.2 million (consisting of $57 million in principal, plus accrued and unpaid interest and fees).  Amegy also claims a lien and asserts an interest in certain assets owned by non-Debtor affiliates.  As of the Petition Date, the balance of the Pre-Petition Loan Agreement was approximately $10.04 million (consisting of $10 million in principal, plus accrued and unpaid interest and fees).  Both the Pre-Petition Credit Agreement and Pre-Petition Loan Agreement are secured by perfected security interests and liens

upon substantially all of the assets of the Debtors, except as described below (the assets of the Debtors that Amegy claims valid, unavoidable liens, security interests, and mortgages of Amegy are hereinafter collectively referred to as the "Pre-Petition Liens").  Amegy is the only pre-petition lender that holds a lien on the Debtors' Cash Collateral.  As of the Petition Date, the Debtors were indebted to Amegy in the aggregate principal amount of approximately $67 million, along with $1.2 million in undrawn letters of credit  (the "Pre-Petition Amegy Debt").[3]

8.     In addition to the Pre-Petition Credit Agreement and Pre-Petition Loan Agreement, the Debtors' debt structure is comprised of approximately $10 million in debt allegedly secured by a lien on HPIB process unit equipment, $5 million in debt allegedly secured by a lien on BPLAO land and equipment (both these obligations have been contractually subordinated to Amegy's Pre-Petition Liens), and a secured vehicle note with a balance of less than $20,000.  None of the non-Amegy secured claims hold interests in Cash Collateral of the Debtors. The Debtors have also issued approximately $2,000,000 in outstanding unsecured notes.

9.     Upon information and belief, mechanic's and materialman's lien affidavits have been filed related to approximately $13.5 million ("Alleged M&M Liens") in debt solely related to the construction of the petrochemical plant.  These alleged liens appear to be, in all respects, subordinate to Amegy's liens on the Debtors' pre-petition assets.  Moreover, the Alleged M&M Liens claim interests in a petrochemical plant that is not currently operating or generating revenues.  The Alleged M&M Liens relate to work on non-cash producing assets of the Debtors and do not extend to Cash Collateral.

---

[3] Amegy has issued two letters of credit totaling $1,200,000, currently undrawn.

10.     As of the Petition Date, the Debtors were current on all required payments under the Pre-Petition Credit Agreement and the Pre-Petition Loan Agreement.  Substantially all of the cash generated by the Debtors' businesses as of the Petition Date constitutes "cash collateral," as such term is defined in section 363(a) of the Bankruptcy Code, and is subject to the security interests of Amegy.

<u>**RELIEF REQUESTED**</u>

11.     The Debtors seek, pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of interim and final orders (the "<u>Interim Order</u>" and "<u>Final Order</u>," respectively), *inter alia,* authorizing the Debtors to obtain post-petition financing under the DIP Facility in an aggregate amount of up to $10,000,000 from the DIP Lender on the terms detailed herein, secured by senior liens on substantially all of the Debtors' assets and given an administrative "super-priority," as discussed herein, authorizing the Debtors to execute all documents, including the DIP Credit Agreement, and take all actions necessary to obtain the proposed financing, scheduling a final hearing, and granting related relief.  The Debtors also seek interim and final orders authorizing the use of Cash Collateral (as defined in 11 U.S.C. § 363(a)) (the "<u>Cash Collateral</u>"), and granting adequate protection to the Pre-Petition Lenders.

12.     The Debtors require the DIP Facility to pay administrative costs associated with these cases, to provide the cash necessary to maintain and maximize the going concern value of their assets (through operation and/or sale), including their HPIB production facility ("<u>HPIB Plant</u>"), to satisfy payroll and employee obligations, and to avoid the immediate liquidation of their estates.  The Debtors simply do not have available sources of working capital to take such

actions without the proposed DIP financing.  The proposed use of the DIP Facility will maintain the value of the Debtors' estates for the benefit of all parties in interest, and will provide working capital to the extent necessary to cover cash shortfalls during these cases.  In light of the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that the proposed DIP Facility, which permits the Debtors to obtain up to $10,000,000 in financing and to use such credit to finance the operation of their businesses and maintain their assets, is critical to their ability to reorganize.

## LEGAL BASES FOR RELIEF REQUESTED

### A.      DIP Financing

#### i.  Legal Standard

13.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

14.     Section 364(d)(1) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the obtaining of credit secured by a senior or equal lien on property of the estate only if:

(A)      the trustee is unable to obtain such credit otherwise; and

(B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be

granted.

11 U.S.C. § 364(d)(1); *see In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

**ii.  The Debtors Have No Viable Alternative to the DIP Facility**

15.    The Debtors have been unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations, and have been unable to obtain financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

16.    A working capital facility of the type needed in these cases could not have been obtained on an unsecured basis.  Moreover, potential sources of the proposed DIP Facility for the Debtors, obtainable on an expedited basis and on reasonable terms, were extremely limited under the current conditions in the capital markets.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1088 (4th Cir. 1986).

17.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code section 364(c) and (d). *Id.*  Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search

for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd,* 99 B.R. 117 (N.D. Ga. 1989).  Thus, evidence to be introduced at the interim hearing on this Motion will satisfy the requirement of section 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

18.     The Debtors believe that the financing arrangements provided by the DIP Lender are the best available at this time.  The terms and conditions of the DIP Facility are fair and reasonable and were heavily negotiated by the parties in good faith and at arm's length.

### iii. Application of the Business Judgment Standard

19.     After appropriate investigation and analysis and given the exigencies associated with the Debtors' bankruptcy filing, the Debtors' management has concluded that the DIP Facility is the only available alternative in the circumstances of these cases.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  *See Group of Institutional Investors v. Chicago, Mil., St. P., & Pac. R.R. Co.,* 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N. A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

20.     In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and

capricious. *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of authority under the Code." *Id.* at 513-14 (footnotes omitted).

21.     The Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate, and the Debtors have satisfied the legal prerequisites to borrow under the DIP Facility. The terms of the DIP Facility are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Facility and borrow funds from the DIP Lender on the secured, administrative super-priority basis described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code and take the other actions contemplated by the DIP Credit Agreement and as requested herein.

### iv. The DIP Facility is Necessary to Effectively Preserve the Value of the Assets of the Debtors' Estates, to Operate Their Businesses and to Successfully Maximize Value of these Estates

22.     No party in interest can seriously contend that the Debtors do not need immediate access to a working capital facility. As with most other substantial businesses, the Debtors have significant cash needs. Accordingly, access to credit is necessary to meet any cash shortfalls associated with maintaining business relationships with the Debtors' vendors and suppliers and otherwise financing their operations.

23.     The DIP Facility will permit the Debtors to take steps to preserve the going concern value of their assets, including the HPIB Plant. Although the Debtors are unable to reactivate the HPIB Plant at this time, it is imperative that the Debtors maintain the value of that facility for purposes of a potential sale under Bankruptcy Code section 363(b). The DIP Facility

will permit the Debtors to maintain the value of the HPIB Plant in several ways.  First, certain of the Debtors' employees have received specialized training regarding the operation and maintenance of the HPIB Plant and those employees possess the expertise necessary to reactivate and operate that facility.  The DIP Facility will enable the Debtors to retain those employees, which will substantially reduce the HPIB Plant's "start-up" time and allow the Debtors or a potential purchaser to operate the plant and generate revenues almost immediately.  Thus, retention of these employees will make the HPIB Plant more attractive to potential purchasers who wish to purchase the Debtors' assets on a going concern basis.  The retention of these employees enhances the value of one of the Debtors' principal assts and makes it more saleable. Additionally, proceeds from the DIP Facility will permit the Debtors to properly maintain the HPIB Plant and other assets so that their value will not deteriorate.

24.     However, if the DIP Facility is not approved, the Debtors likely will be unable to retain the employees described in the preceding paragraph and will be unable to take other steps necessary to preserve the value of their assets.  Further, absent the proposed DIP Facility, there is a high likelihood that the Debtors will be forced to liquidate their assets, which will likely involve the piecemeal fire sale of parts for a small fraction of their collective going concern value.  This result is contrary to the interests of the Debtors, creditors, and all parties in interest.

### v.  Adequate Protection

25.     Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the Court may only authorize incurring debt secured by such liens if, *inter alia*, "there is adequate protection of the interest of

the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d).

26.    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (noting that adequate protection is determined on a case-by-case basis with a focus on protecting secured creditors from diminution in value of collateral); *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (quotation marks omitted)). The purpose of the adequate protection requirement is to insure that the secured creditor receives the value that the secured creditor bargained for prebankruptcy. House Rep. No. 95-595, 95 Cong., 2d Sess. 53, reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6295; *see In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests.").

27.    Examples of adequate protection are provided for in Section 361 of the Bankruptcy Code and include, but are not limited to: (i) making a cash payment or periodic cash payments to a secured creditor to the extent that the estate's use of property will result in a decrease in the value of such creditor's interest in the property; (ii) provisions for an additional or replacement lien to the extent that the use of such property will cause a decrease in the value of such entity's interest in the property; and (iii) granting such other relief as will result in the realization by the creditor of the indubitable equivalent of such creditor's interest in the property. *See* 11 U.S.C. §

361; *Perez v. Peake,* 373 B.R. 468, 483 (S.D. Tex. 2007); *In re C.G. Chartier Constr., Inc.,* 126 B.R. 956, 960 (E.D. La. 1991).

28.     The section 361 list is non-exclusive and other factors can provide adequate protection.  *See In re Briggs Transp. Co.*, 780 F.2d 1348, 1349-50 (8th Cir. 1985) (discussing Bankruptcy Code section 361 in the automatic stay context); *In re Yellowstone Dev., LLC*, No. 08-61570-11, 2008 WL 5875547, at **9-*12, *17-*18 (Bankr. D. Mont. Dec. 17, 2008) ("[T]he use of the DIP Loan proceeds [for] the maintenance of the going concern value of the Debtors' businesses and their assets, is reasonable and sufficient to protect the interests of the [prepetition secured creditors].").  For example, in *In re Yellowstone*, the court found that use of a DIP loan's proceeds to maintain the going concern value of the debtor's assets constituted adequate protection where the alternative was a shut down and liquidation of assets.  *See id.*  Ultimately, "whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given the post-petition loan.  In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing."  *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3rd Cir. 1994).[4]

29.     Adequate protection of the interests of pre-petition secured creditors exists under the facts of the present case.  The Debtors require the proposed DIP Facility in order to continue to operate their businesses and maintain the value of their assets, as described above.  In particular, the DIP Facility will permit the Debtors to retain key employees who possess valuable skills necessary to reactivate and operate the HPIB Plant, which will dramatically reduce the

---

[4] The court in Swedeland refers to priming liens under Bankruptcy Code section 364(d) as a "superpriority" lien. *See id.*

time it would take the Debtors or a potential purchaser to begin operating the plant and generating revenues. This will make the HPIB Plant more attractive to potential purchasers and will maximize the value that the Debtors can derive from this key asset. The Debtors will also use the proposed DIP Facility to prevent deterioration of the HPIB Plant, along with their other assets, in order to preserve the possibility of a going concern sale of some or all of the Debtors' assets.

30.    The Debtors recognize that the HPIB Plant is not currently operating, and thus, any sale of that facility would not be the sale of an operating "going concern" business, as that term is typically used. The Debtors use the term "going concern" herein because approval of the DIP Facility will permit the Debtors to preserve the HPIB Plant such that a purchaser can begin operating the plant with a trained group of employees and a team that has previously operated the facility as late as August 2009. In this situation, the Debtors will be selling a production facility that can be operated to produce HPIB. However, absent approval of the DIP Facility, the Debtors likely will be forced to liquidate their assets and will be unable to maintain the HPIB Plant, or retain the skilled workers to necessary operate that facility, resulting in a vast reduction in the value of the plant that can be available ultimately to creditors.

31.    Simply put, the DIP Facility will enable the Debtors to maintain the going concern value of their assets and avoid liquidation. By using the DIP Facility to protect creditors from diminution in the value of their collateral, the Debtors' proposed use of such funds is consistent with the purpose of Bankruptcy Code section 361. *See In re Mosello,* 195 B.R. at 289 ("[The] focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (quotation marks omitted)); *see also In re Hubbard Power &*

*Light*, 202 B.R. at 685 (similar).  Moreover, the going concern value of the Debtors' assets exceeds their liquidation value to a degree sufficient to provide pre-petition secured parties with adequate protection.

### vi.  The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate

32.     The proposed terms of the DIP Facility referenced herein are fair, reasonable and adequate in that these terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits.  The purpose of the DIP Facility is to enable the Debtors to maintain the value of their assets and to meet ongoing operational expenses, including administrative expenses.

33.     The proposed DIP Facility provides that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve-Out.  Bankruptcy courts generally find that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel.  *See In Ames Dep't Stores, Inc.,* 115 B.R. at 38.

34.     Likewise, the various fees and charges required by the DIP Lender under the DIP Facility are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code.  *See Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.),* 375 B.R. 112, 115 (Bankr. D. Del. 2007) (noting the fees and other terms previously approved by the court); *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 885 (Bankr. E.D. Pa. 2007) (same); *In re Defender Drug Stores, Inc.,* 145 B.R. 312, 316-18 (9th

Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

35.     The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated by the parties in good faith and at an arm's length.  Accordingly, the DIP Lender under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

36.     The fairness and reasonableness of the terms of the DIP Facility will be further shown at the Interim and Final Hearings.

### vii.  Request for Modification of Automatic Stay

37.     The proposed DIP Facility contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code under terms usual and customary with transactions of this nature.  Such stay modification provisions are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  The Court accordingly should modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the Interim Order.

### B.      Cash Collateral

38.     In addition to the DIP financing, the Debtors are also requesting interim and final orders authorizing the use of the Cash Collateral, for the purposes and amounts set forth in the applicable budget.  Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in

accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Thus, the Court can approve the Debtors' use of Cash Collateral if the Debtors provide adequate protection to Amegy.  *See, e.g., In re Energy Partners, Ltd.*, 409 B.R. 211, 235-36 (Bankr. S.D. Tex. 2009).

39.     As discussed above, the determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *In re First S. Sav. Ass'n*, 820 F.2d at  710; *In re Mosello,* 195 B.R. at 289.  In exchange for the use of the Cash Collateral, and for any diminution in the value of the Pre-Petition Lenders' interest in other Pre-Petition Collateral, the Debtors will provide Amegy, for itself on behalf of the Pre-Petition Lenders, with (i) a superpriority claim having priority over all administrative expenses, subject and subordinate only to the Carve-Out and claims under the DIP Facility, (ii) replacement liens in and upon substantially all of the assets of the Debtors, subject only to (x) the Carve-Out, (y) the DIP Liens and (z) any valid perfected, enforceable and unavoidable liens (A) existing as of the Petition Date or (B) pursuant to sections 546 and 362(b)(18) of the Bankruptcy Code, which are permitted to exist under the Pre-Petition Loan Documents and that are otherwise senior to the Pre-Petition Liens in favor of the Pre-Petition Lenders securing repayment of the Pre-Petition Obligations (if any), and (iii) payment of all reasonable costs and expenses of any counsel or financial advisors to Amegy, including reasonable attorney and advisor fees on a current basis without the need for filing fee applications or fee statements.  The Pre-Petition Lenders reserve the right to assert claims for

additional interest at default rates and interest under the Pre-Petition Loan Documents will continue to accrue.  Accordingly, the Debtors request that the Court authorize the Debtors' use of Cash Collateral subject to the applicable budget.

**C.        Request for Immediate Interim Relief**

40.       Pending the Final Hearing, the Debtors require immediate use of the financing provided by the DIP Facility.   It is essential that the Debtors immediately stabilize their operations and pay for ordinary, post-petition operating expenses.

41.       Absent immediate use of the DIP financing, the Debtors will be unable to pay ongoing operational expenses.  Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors and other parties in interest.

42.       Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to obtain interim credit under the DIP Facility, in accordance with and pursuant to the terms and conditions contained in the DIP Credit Agreement and the Interim Order.

43.       Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."   FED. R. BANKR. P. 4001(c)(2).   In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Ames Dep't Stores, Inc.,* 115 B.R. at 38. After the 15-day period, the request for financing is not limited to those amounts necessary to

prevent destruction of the debtor's business.  A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  *See, e.g., In re Simasko Prod. Co.,* 47 B.R. at 449*; In re Ames Dep 't Stores, Inc.,* 115 B.R. at 36.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Debtors request this Court to enter interim and final orders authorizing the use of Cash Collateral, granting adequate protection to the Pre-Petition Lenders, authorizing the Debtors to obtain post-petition financing on an interim and final basis on the terms detailed herein, and as will be further detailed in the DIP Documents and other materials furnished subsequently to the Court, as well as scheduling a final hearing, and granting related relief.

Respectfully submitted this 17th day of November 2009.

Respectfully submitted,

**KING & SPALDING LLP**

By: /s/ Henry J. Kaim
Henry J. Kaim
Texas Bar No. 11075400
HKaim@kslaw.com
Mark W. Wege
Texas Bar No. 21074225
MWege@kslaw.com
Edward L. Ripley
Texas Bar No. 16935950
ERipley@kslaw.com
1100 Louisiana, Suite 4000
Houston, Texas  77002
Telephone:  (713) 751-3200
Fax: (713) 751-3290


**PROPOSED ATTORNEYS
FOR THE DEBTORS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing pleading was served upon the parties eligible to receive service through the Clerk's Office ECF facilities by electronic mail, and was directed to BMC Group, Inc., Noticing Agent, for service on the parties listed on the attached Master Service List, on this 17th day of November  2009.

 /s/ Henry J. Kaim_____
Henry J. Kaim
