# **EXHIBIT B**

Engagement Agreement

# PARKMAN WHALING LLC

Effective as of November 15, 2009

Mr. H. Malcolm Lovett, Jr.
Chief Restructuring Officer
Bigler, LP
1920 N. Memorial Way, Suite 201
Houston, Texas 77007

Dear Mr. Lovett:

Thank you for selecting Parkman Whaling LLC ("Parkman Whaling") to serve as the financial advisor to Bigler, LP and its affiliates (collectively, with its subsidiaries and affiliates, the "Company"). Bigler, LP, Bigler Land, LLC, Bigler Petrochemical, LP, Bigler Plant Services, LP and Bigler Terminals, LP are currently debtors in possession under chapter 11 of the Bankruptcy Code in Case No. 09-38188, Jointly Administered, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). Parkman Whaling acknowledges that this engagement is subject to approval of the Bankruptcy Court. This letter and the attached Standard Terms of Engagement, which are incorporated herein by this reference (collectively, the "Agreement"), set forth our mutual understanding and agreement as to the terms of our engagement. If appropriate in connection with performing its services for the Company hereunder, Parkman Whaling may utilize the services of one or more of its affiliates, including but not limited to Parkman Whaling Securities LLC, in which case the references herein to Parkman Whaling shall include such affiliates.

1) <u>Scope of Engagement</u>. Subject to and in accordance with the Standard Terms of Engagement, Parkman Whaling will assist the Company as its exclusive investment banker, financial advisor and agent in connection with any Transaction (as such terms are defined in this Agreement) or such other services as the Company requires hereunder. Upon execution of this Agreement Parkman Whaling will commence its review of the Company's financial position, financial history, operations, competitive environment, and assets to assist the Company in determining the best means to implement the most appropriate strategy, subject to approval by the Company. In connection with our role as your investment banker and financial advisor, we would expect to, as requested:

   a) Evaluate the Company's strategic options based upon Parkman Whaling's initial review;

   b) Advise the Company as to potential mergers or acquisitions, and the sale or other disposition of any of the Company's assets or businesses;

   c) Advise the Company generally as to available financing and capital restructuring alternatives, including recommendations of specific courses of action;

   d) Assist the Company with the development, negotiation and implementation of a restructuring plan (the "Plan"), including participation as an advisor to the Company in negotiations with creditors and other parties involved in a restructuring if requested by the Company;

e) Assist the Company with the design of any debt and equity securities or other consideration to be issued in connection with a Plan;

f) Assist the Company in communications and negotiations with its constituents, including, creditors, employees, vendors, shareholders and other parties-in-interest in connection with any Plan; and

g) Render such other financial advisory and investment banking services as may be mutually agreed upon by Parkman Whaling and the Company.

2) <u>Compensation.</u> Subject to approval of the Bankruptcy Court, in consideration of our services pursuant to this Agreement, Parkman Whaling shall be entitled to receive, and the Company shall pay to Parkman Whaling the following compensation:

a) *Monthly Fee:* Parkman Whaling shall be paid a monthly fee (the "Monthly Fee") each month in advance for its services of $25,000 per month, plus Expenses ("Expenses" as defined herein) that are incurred by Parkman Whaling on behalf of the Company. Upon approval of this Agreement by the Bankruptcy Court, the Company shall pay Parkman Whaling its initial Monthly Fee of $25,000. The Company shall pay the Monthly Fee on each monthly anniversary of the Effective Date of this Agreement, in advance.

b) *Financing Transaction Fees:* If the Company requests that Parkman Whaling pursue a Financing Transaction, whether on a stand-alone basis or to consummate a Restructuring Transaction, then Parkman Whaling shall act as the Company's exclusive agent in connection with raising such Financing Transaction, and shall be paid a fee equal to the sum of two percent (2%) of the proceeds of all secured debt, four percent (4%) of all subordinated debt, and six percent (6%) of all equity, which fee shall be paid immediately out of the proceeds of such placement.

c) *Restructuring Transaction Fees:* In connection with any Restructuring Transaction, Parkman Whaling shall act as the Company's exclusive agent, and the Company shall pay a cash fee equal to the fee that would be paid pursuant to paragraph d) below as if such Restructuring Transaction had been characterized as an M&A Transaction; such fee to be payable on the earlier of (i) the date of closing or (ii) effectiveness of such Restructuring Transaction.

d) *M&A Transaction Fees:* In connection with any M&A Transaction, Parkman Whaling shall act as the Company's exclusive agent. The Company shall pay Parkman Whaling at the closing of any M&A Transaction, in cash, an M&A Transaction Fee based on Aggregate Gross Consideration (defined below)("AGC") equal to: (i) one percent (1.0%) of AGC up to and including $75 million; plus, (ii) one and one-half percent (1.5%) of AGC in excess of $75 million. If there is more than one M&A Transaction consummated, Parkman Whaling will be compensated based on the AGC of all M&A Transactions as set forth above.

e) *Non Duplication of Fees*: For purposes of computing compensation, a single transaction cannot be both a Restructuring Transaction and an M&A Transaction. For avoidance of doubt, Parkman Whaling will not be entitled to a Financing Transaction Fee if a counter-party to any Restructuring Transaction or M&A Transaction sources its own financing.

<u>Aggregate Gross Consideration ("AGC").</u> For the purpose of calculating the M&A Transaction Fee, the term "Aggregate Gross Consideration" shall mean: (i) the value of liabilities assumed, decreased or paid off in conjunction with an M&A Transaction, and the fair market value of any of the Company's assets that are retained, sold or otherwise transferred to another party prior to the consummation of an M&A Transaction; plus, (ii) the total proceeds and other consideration paid or received, or to be paid or received, by the Company and/or its creditors and equity holders in connection with an M&A Transaction (which consideration shall be deemed to include amounts in escrow), including, without limitation, cash, notes, securities, other property and payments made in installments.

For the purpose of calculating the Aggregate Gross Consideration received in an M&A Transaction, any securities (other than a promissory note) will be valued at the time of closing of the M&A Transaction as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the closing of the M&A Transaction; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten trading day period immediately prior to the closing of the M&A Transaction; and (iii) if such securities have not been traded prior to the closing of the M&A Transaction, Parkman Whaling will prepare a valuation of the securities, and Parkman Whaling and the Company will negotiate in good faith to agree on a fair valuation thereof for the purposes of calculating the M&A Transaction Fee. The value of any purchase money or other promissory notes shall be deemed to be the fair value thereof. In the event the Aggregate Gross Consideration includes any Contingent Payments, Parkman Whaling shall be paid its M&A Transaction Fees based on the fair market value of such Contingent Payments as of closing and shall be paid such M&A Transaction Fees at the time of payment or release from escrow.

f) *Break-up Fees:* In the event the Company enters into an agreement with respect to a Transaction that is subsequently terminated during the term of this Agreement or the Tail Period and the Company receives a "break-up" or "termination" fee, then Parkman Whaling shall be entitled to a fee in an amount equal to 10% of such payment.

g) *Other Services and Fees:* To the extent the Company requests Parkman Whaling to perform additional services not otherwise identified herein, then the Company and Parkman Whaling shall enter into an amendment to this Agreement concerning Parkman Whaling's services and fees for such services, which fees shall be on a mutually acceptable basis, subject to Bankruptcy Court approval.

h) *Expenses:* In addition to the fees described above, the Company agrees to promptly reimburse Parkman Whaling, upon request from time to time, for all out-of-pocket expenses incurred by Parkman Whaling in connection with the matters contemplated by this Agreement, including, without limitation, fees of counsel exclusive of expenses

incurred pursuant to paragraph 15 <u>Indemnification</u> of the "Standard Terms of Engagement" attached hereto.

i) *Tail Period:* Parkman Whaling shall be entitled to the fees enumerated in any preceding subparagraph of this paragraph upon the earlier of (i) the occurrence, during the term, or within twelve (12) months after the date of termination, of this Agreement (such twelve month period being referred to as the "Tail Period"), of a Financing Transaction, a Restructuring Transaction, an M&A Transaction or other Transaction or (ii) the occurrence of any Transaction specified in any such subparagraph with respect to which an agreement to consummate such Transaction was executed by the Company during the term or within the Tail Period.

j) *Assignment: Association or Affiliation of Broker/Dealer:* Neither Parkman Whaling LLC nor the Company may assign this Agreement without the prior written consent of the other party, which consent may be given or withheld entirely within the discretion of the non-assigning party. Notwithstanding the above, if Parkman Whaling LLC, in its sole discretion, determines that the transaction ultimately contemplated requires a registered broker/dealer in order to comply with applicable laws, Parkman Whaling LLC may assign this Agreement and/or the securities compensation and related securities activities and services set forth herein at any time to Parkman Whaling Securities LLC an affiliated broker-dealer registered with the Securities Exchange Commission and a member of the Financial Industry Regulatory Authority.

The Company and Parkman Whaling acknowledge and agree that the hours worked, the results achieved and the ultimate benefit to the Company, of the work performed, in each case, in connection with this engagement, may vary, and that the Company, its shareholders and Parkman Whaling have taken this into account in setting the fees hereunder.

3) <u>Execution</u>. If the terms hereof correctly set forth our understanding and agreement, please so indicate by signing and returning the enclosed copy of this Agreement, and signing and retaining a duplicate for your records.

This Agreement shall be effective as of November 15, 2009 (the "Effective Date").

Very truly yours,

PARKMAN WHALING LLC
By: *[signature]*
Thomas B. Hensley, Jr.

The foregoing Agreement (including the attached Standard Terms of Engagement) have been read, understood, accepted and approved, and the undersigned does hereby agree to retain Parkman Whaling LLC upon the terms and provisions contained herein.

BIGLER, LP
By *[signature]*
H. Malcolm Lovett, Jr.
Chief Restructuring Officer
Its Authorized Signatory

## STANDARD TERMS OF ENGAGEMENT

### BIGLER, LP

1. <u>Transaction.</u> As used herein the term "Transaction" shall mean, collectively:

   An "M&A Transaction" as used herein shall mean (a) any merger, consolidation, reorganization, recapitalization, business combination or other transaction pursuant to which the Company is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (including, without limitation, existing creditors, employees, affiliates, and/or shareholders) (collectively, an "Investor"); or (b) the acquisition, directly or indirectly, by an Investor (or by one or more persons acting together with an Investor pursuant to a written agreement or otherwise), in a single transaction or a series of transactions, of (i) any material portion of the assets or operations of the Company, or (ii) any outstanding or newly-issued shares of the Company's capital stock (or any securities convertible into, or options, warrants or other rights to acquire such capital stock) (such capital stock and such other securities, options, warrants and other rights being collectively referred to as "Company Securities") resulting in holders of shares of the Company's capital stock immediately prior thereto owning less than 50% of such capital stock immediately thereafter.

   A "Financing Transaction" as used herein shall mean the issuance, whether public or private, of debt and/or equity securities for or on behalf of the Company (whether to raise funds, refinance outstanding securities or exchange securities or any combination thereof) or such other financing of any type raised to complete any other Transaction.

   A "Restructuring Transaction" as used herein shall mean (a) any modification which effects amendments to, or other changes in, the instruments or terms pursuant to which any of the Company Obligations were issued or entered into, the effect of which is to reduce the outstanding principal balance of such Company Obligations or the issuer's cash debt service requirement in respect of such Company Obligations or any other material modification that allows the Company to restructure (either in-court or out-of-court) on a stand-alone basis whereby a majority of the Company's common equity (on a fully diluted basis) is owned by existing creditors and/or shareholders; (b) any transaction in which the requisite consent of a reorganization or restructuring are obtained either out-of-court or pursuant to a plan under the Bankruptcy Code (a "Plan"); or (c) any other going concern exit from a proceeding under Chapter 11 of the Bankruptcy Code.

   "Company Obligations" as used herein shall mean any of the Company's funded debt obligations, customer contracts or trade credit (including any preferred equity) outstanding as of the Effective Date.

1

2. <u>Advice</u>. Except as may be required by law or court process, any opinions or advice (whether written or oral) rendered by Parkman Whaling pursuant to this Agreement are intended solely for the benefit and use of the Company, and may not be publicly disclosed in any manner or made available to third parties (other than the Company's management, directors, advisors, accountants and attorneys) without the prior written consent of Parkman Whaling, which consent shall not be unreasonably withheld.

3. <u>Credit.</u> Parkman Whaling is hereby authorized, upon the consummation of a Transaction, at its own expense to place a customary "tombstone" advertisement or similar announcement in such form and in such media as Parkman Whaling deems appropriate.

4. <u>Termination</u>. The Company may terminate this Agreement upon 30 days written notice at any time after the third month of this Agreement and Parkman Whaling may terminate this Agreement at any time upon 30 days written notice, in either case, without liability or continuing obligation; <u>provided, however,</u> that no expiration or termination of this Agreement shall affect (a) the Company's indemnification, reimbursement, contribution and other obligations as set forth in this Agreement, (b) the confidentiality provisions set forth herein and (c) Parkman Whaling's right to receive, and the Company's obligation to pay, any and all fees and expenses due, whether or not any Transaction shall be consummated prior to or subsequent to the effective date of termination, all as more fully set forth in this Agreement.

5. **<u>Choice of Law.</u> THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO SUCH STATE'S RULES CONCERNING CONFLICTS OF LAW, EACH OF PARKMAN WHALING AND THE COMPANY (ON IT'S OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS EQUITY HOLDERS) WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF PARKMAN WHALING PURSUANT TO, OR THE PERFORMACE BY PARKMAN WHALING OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.**

6. <u>Other Services</u>. To the extent Parkman Whaling is requested by the Company to perform any financial advisory or investment banking services which are not within the scope of this assignment (such as rendering a fairness opinion), such fees shall be mutually agreed upon by Parkman Whaling and the Company in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove.

7. Attorneys' Fees and Court Costs. If any party to this Agreement brings an action directly or indirectly based upon this Agreement or the matters contemplated hereby against the other party, the prevailing party shall be entitled to recover, in addition to any other appropriate amounts, its costs and expenses in connection with such proceeding, including, but not limited to, attorneys' fees and court costs.

8. Authority. Subject to Bankruptcy Court approval, the Company has all requisite corporate power and authority to enter into this Agreement and the transactions contemplated hereby (including, without limitation, any Transaction). The Company and Parkman Whaling have fully reviewed this Agreement, have obtained counsel on its terms, and have participated in the drafting of this Agreement such that it shall not be construed against any one party. Subject to Bankruptcy Court approval, this Agreement has been duly and validly authorized by all necessary corporate action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms.

9. Exclusive Agency. Until this Agreement is terminated, the Company agrees that it will not, directly or indirectly, contact, approach or negotiate with any person or persons regarding any M&A Transaction, Financing Transaction, Restructuring Transaction, or transaction similar to such transaction, other than through or with the consent of Parkman Whaling.

10. Counterparts. For the convenience of the parties, any number of counterparts of this Agreement may be executed by the parties hereto. Each such counterpart shall be, and shall be deemed to be, an original instrument, but all such counterparts taken together shall constitute one and the same Agreement.

11. Information. In connection with Parkman Whaling's activities on the Company's behalf, the Company will cooperate with Parkman Whaling and will furnish, or cause to be furnished, to Parkman Whaling any and all information and data concerning the Company (the "Information") which Parkman Whaling deems appropriate, and will provide Parkman Whaling with access to the Company's officers, directors, employees, appraisers, independent accountants, legal counsel and other consultants and advisors. The Company represents and warrants that all Information (a) made available to Parkman Whaling or (b) contained in any filing by the Company with any court or any governmental or regulatory agency, commission or instrumentality (each, an "Agency"), will at all times during the period of the engagement of Parkman Whaling hereunder, be complete and correct in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in the light of the circumstances under which such statements are made. The Company further represents and warrants that any projections or other information provided by it to Parkman

3

Whaling will have been prepared in good faith and will be based upon assumptions, which, in light of the circumstances under which they are made, are reasonable.

The Company acknowledges and agrees that, in rendering its services hereunder, Parkman Whaling will be using and relying on the Information (and information available from public sources and other sources deemed reliable by Parkman Whaling) without independent verification thereof by Parkman Whaling or independent appraisal by Parkman Whaling of any of the Company's assets. Parkman Whaling does not assume responsibility for the accuracy or completeness of the Information or any other information regarding the Company.

12. Role as Advisor. In performing its services under this Agreement, Parkman Whaling is not assuming any responsibility for the Company's decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Transaction. Parkman Whaling shall not have any obligation or responsibility to provide "crisis management" for or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

13. Successors. This Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, however, is intended to confer or does not confer on any person or entity, other than the parties here to and their respective successors and permitted assigns and, to the extent expressly set forth herein, the Indemnified Parties, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Parkman Whaling hereunder.

14. Miscellaneous. If it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that any term or provision hereof is invalid or unenforceable. (i) the remaining terms and provisions hereof shall be unimpaired and shall remain in full force and effect and (ii) the invalid or unenforceable provision or term shall be replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term or provision. This Agreement embodies the entire agreement and understanding of the parties here to and supersedes any and all prior agreements, arrangements and understanding relating to the matters provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each party.

The parties understand that Parkman Whaling is being engaged hereunder to provide the services described above solely to the Company, and that Parkman Whaling is not acting as an agent or fiduciary of, and shall have no duty of loyalty to, the equity holders or creditors

of the Company or any other third parties in connection with this engagement. The Company agrees that it will be solely responsible for ensuring that any Transaction or Financing Transaction complies with applicable law.

15. <u>Indemnification.</u> As a material part of the consideration for the agreement of Parkman Whaling to furnish its services under the Agreement, the Company agrees to indemnify and hold harmless Parkman Whaling and its affiliates, and their respective past, present and future directors, officers, shareholders, employees, agents, and controlling persons within the meaning of either the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to the Agreement, any actions taken or omitted to be taken by an Indemnified Party (including acts or omissions constituting ordinary negligence) in connection with the Agreement, or any Transaction or proposed Transaction contemplated thereby. In addition, the Company agrees to reimburse the Indemnified Parties for any legal or other expenses incurred by them in respect thereof at the time such expenses are incurred; <u>provided, however</u>, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined to have resulted primarily from the willful misconduct or gross negligence of any Indemnified Party.

If for any reason the foregoing indemnification is unavailable to any Indemnified Party or insufficient to hold it harmless, the Company shall contribute to the amount paid or payable by the Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, on the one hand, and Parkman Whaling, on the other hand, in connection with the actual or potential Transaction and the services rendered by Parkman Whaling. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or otherwise, then the Company shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company, on the one hand, and Parkman Whaling, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, the aggregate contribution of all Indemnified Parties to any such losses, claims, damages, liabilities and expenses shall not exceed the amount of fees actually received by Parkman Whaling pursuant to the Agreement.

The Company shall not effect any settlement or release from liability in connection with any matter for which an indemnified party would be entitled to indemnification from the Company, unless such settlement or release contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Parkman Whaling. The Company shall not

5

be required to indemnify any Indemnified Party for any amount paid or payable by such party in the settlement or compromise of any claim or action without the Company's prior written consent.

Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant proportion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Parkman Whaling in writing thereof (if not previously so notified) and, if requested by Parkman Whaling, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions satisfactory to Parkman Whaling.

The Company further agrees that neither Parkman Whaling nor any other Indemnified Party shall have any liability, regardless of the legal theory advanced, to the Company or any other person or entity (including the Company's equity holders and creditors) related to or arising out of Parkman Whaling's engagement, except for any liability for losses, claims, damages, liabilities or expenses incurred by the Company which are finally judicially determined to have resulting primarily from the willful misconduct or gross negligence of any Indemnified Party.

The indemnity reimbursement, contribution and other obligations and agreements of the Company set forth herein shall apply to any modifications of the Agreement, shall be in addition to any liability which the Company may otherwise have, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and each Indemnified Party. The foregoing provisions shall survive the consummation of any Transaction and any termination of the relationship established by the Agreement.