

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**12/15/2010**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **BIGLER, LP;** | § | **Case No. 09-38188** |
| **BIGLER LAND, LLC;** | § | **Case No. 09-38189** |
| **BIGLER PETROCHEMICAL, LP;** | § | **Case No. 09-38190** |
| **BIGLER PLANT SERVICES, LP;** | § | **Case No. 09-38192** |
| **BIGLER TERMINALS, LP** | § | **Case No. 09-38194** |
| | § | |
| Debtors. | § | **Chapter 11** |
| | § | |
| | § | **Jointly Administered Under** |
| | § | **Case No. 09-38188** |
| | § | |

## MEMORANDUM OPINION DENYING VOPAK NORTH AMERICA, INC.'S REQUEST TO REOPEN AUCTION TO ALLOW HIGHER BIDS TO BE SUBMITTED
[Docket No. 423]

### I. INTRODUCTION

This Memorandum Opinion is written to underscore this Court's concern with an attempt to reopen an auction that was unquestionably fair. Indeed, both the bid procedures and the manner in which the auction was conducted were beyond reproach. The issue is whether this Court should reopen the bidding simply because one of the parties who participated at the auction now wants to make a higher offer. For the reasons set forth herein, the Court declines to reopen the bidding. Indeed, the Court believes that it would be abusing its discretion if it took such action.

### II. PROCEDURAL AND FACTUAL BACKGROUND

On October 30, 2009, Bigler, LP, Bigler Land, LLC, Bigler Petrochemical, LP, Bigler Plant Services, LP, and Bigler Terminals, LP (collectively, the Debtors) filed a voluntary Chapter 11 petition. [Docket No. 1]. On May 11, 2010, the Debtors filed their Motion for Entry of (I) an Order (A) Approving Bidding and Notice Procedures Related to Sale of Substantially All of the Debtors'

Assets; and (B) Scheduling a Hearing to Consider the Sale; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets; and (B) Approving the Assumption and Assignment of Certain Executory Contracts and Expired Leases (the Bid Procedures Motion).[Docket No. 309].

Several creditors filed a myriad of objections to the Bid Procedures Motion. [Docket Nos. 326, 336, 340, 341 & 347]. On May 26 and 27, 2010, this Court held a hearing on the Bid Procedures Motion. On May 28, 2010, this Court entered an order granting the Bid Procedures Motion (the Bid Procedures Order), with the bid procedures attached thereto (the Bid Procedures). [Docket No. 356]. The Bid Procedures were drafted and negotiated by very sophisticated parties and their attorneys. Moreover, the Bid Procedures Order, which is very detailed, was signed off as to form by counsel for: (1) the Debtors; (2) the Official Committee of Unsecured Creditors (the Committee); (3) Amegy Bank; (4) Halgo Power, Inc.; (5) Contech Control Services, Inc.; (6) Shaw Maintenance, Inc.; (7) Englobal Engineering, Inc.; (8) Buckeye Texas Pipe Line Company; (9) Catalytic Distillation Technologies; and (10) A. Anthony Annunziato, the Ashley Elizabeth Scianna Arora Investment Trust and the Stephanie Elizabeth Scianna Investment Trust. All of the attorneys who signed off as to form are very sophisticated and extremely experienced bankruptcy lawyers. Under these circumstances, there is no question that all active participants in this Chapter 11 case had ample opportunity to review and give comments on the Bid Procedures Order and the Bid Procedures.

Moreover, these documents left no doubt that: (1) the auction would be held at the law offices of King & Spalding, LLP (K & S)—the law firm which represents the Debtors in this case—on June 16, 2010, beginning at 10:00 a.m.; (2) the Debtors were required to file a notice with this Court by no later than noon on June 18, 2010 disclosing the results of the auction, including who the highest

bidder was and the amount of the highest bid; and (3) a hearing would be held in this Court at 10:00 a.m. on June 23, 2010 seeking this Court's approval and authorization for the Debtors to sell the property to the party that made the highest bid at the June 16 auction.[1]

The Court now reviews these events in greater detail to distinguish those cases cited by the parties who have argued that this Court should reopen the auction to allow for higher bids.

## A.    The June 16 Auction

The Bid Procedures Order and the Bid Procedures, in relevant part, state the following with respect to the auction to be held on June 16, 2010:

> As further described in the Bid Procedures, the Debtors shall conduct the Auction(s), as applicable, at 10:00 a.m. on June 16, 2010, at the offices of counsel for the Debtors, King & Spalding, 1100 Louisiana, Suite 4000, Houston, Texas 77002.
>
> [Docket No. 356, p. 3].
>
> Upon conclusion of the bidding, the Auction shall be **closed**, and the Debtors, after consultation with Amegy and the Creditors' Committee, shall immediately (I) review each Qualified Bid on the basis of the Bid Assessment Criteria and the financial and contractual terms and the factors affecting the speed and certainty of consummating the Proposed Sale; and (ii) upon such review, the Debtors shall immediately identify the highest, best, financial or otherwise superior offer for the Assets . . . and advise the Qualified Bidders of such determination.

[Docket No. 356, p. 18] (emphasis added).

And, indeed, the auction, as required by the Bid Procedures Order, began at 10:00 a.m. on June 16, 2010, at the Houston law offices of K & S and was concluded almost twelve hours later, at 9:32 p.m. [Docket No. 363, p. 3]; [Debtor's Ex. No. 8, p. 47]. At the beginning of the auction, Ed

---

[1] The asset to be sold at this particular auction was approximately 180 acres of real property owned by the estate (the Property).

Ripley (Ripley)[2] carefully laid out the procedures that would take place—including what constituted the closing of the auction. [Debtor's Ex. No. 8, p. 6–7]. Ripley explained the following:

> When the bidding is completed, we will adjourn so that the debtors, in consultation with Amegy Bank, and the creditors' committee, will decide and come back and announce on the record the identity of the successful bid or bidders and the backup bid or bidders.

> At that point, the auction will be closed, and we will work to get the signed asset purchase agreements with the successful and the backup bid or bidders completed.

> The parties that submitted the successful bid or bids and the backup bid or bids will have by the close of business 5 p.m. Friday—this Friday, June 18th, to wire transfer the amount necessary to increase their current earnest money deposit to 10 percent of whatever the successful or backup bid is, using the exact same wire transfer instructions.

[Debtor's Ex. No. 8, p. 7–8].[3]

Once Ripley laid out these procedures, the auction began and, over eleven hours of active bidding (including breaks), the participants made increasingly higher bids for the Property.[4] The initial bid was for $7,762,392.00. [Debtor's Ex. No. 8, p. 5, lines 9–11]. Eventually, Intercontinental Terminals Company, LLC (ITC) made a bid of $20.5 million, and none of the other participants at the auction made a higher bid. [Debtor's Ex. No. 7]. The next highest bid was for $20.3 million

---

[2] Ripley is one of the K & S attorneys representing the Debtors. He served as auctioneer at the June 16 auction. A transcript of the auction was made and this Opinion cites statements transcribed at this auction.

[3] It is worth noting that the Bid Procedures involved not only the Debtors, but Amegy Bank (the largest secured creditor in the case) and the Committee. That not only the Debtors, but also these two other important parties in interest, had a voice in deciding which bid to take to Court for approval on June 23 underscores the fairness and thoroughness of the auction.

[4] There were 55 bids made among the bidding parties in increments ranging from $100,000.00 to $300,000.00. [June 23, 2010 Tr. 44:16–17].

made by Vopak Terminals North America, Inc. (Vopak). [Debtor's Ex. No. 7].[5] Amegy Bank was

also a bidder at the auction and made credit bids, but none of its credit bids exceeded $20.3 million.

[Debtor's Ex. No. 8, p. 18].

There is no question that both Vopak and Amegy Bank had an opportunity to bid higher than

$20.5 million at this stage of the auction, but instead chose not to do so. [Debtor's Ex. No. 8, p. 46].

Indeed, the testimony adduced from Vopak's representative on cross-examination by ITC's counsel

is telling:

Q: When the bidding got to 20 million, you went beyond that to $20,300,000, right?

A: Correct.

Q: And you elected to stop bidding at $20,300,000, right?

A: Correct.

Q: And ITC went to $20,500,000, right?

A: Correct.

Q: And you elected not to bid more than the $20,300,000 that you—was your last bid.

A: Based on the information I had at that point in time, that's correct.

Q: Did anybody or any part of the process prevent you from calling back to

headquarters for more authority to top the ITC $20,500,000 bid?

A: No.

Q: Did you make an effort to do so?

---

[5] Vopak and ITC are competitors in the storing and handling of bulk liquids. [June 23, 2010 Tr. 117:19; 119:5–8].

A: I am—as you recall, we asked for a final recess before we took that position, and

I did have dialog with our president and we jointly decided not to bid any further.

Q: And nobody at the auction prevented you from bidding over the $20,300,000, right?

A: Correct.

[June 23, 2010 Tr. 112:1–22].

Moreover, Ripley—well into the evening of June 16, 2010—made sure that all parties understood that bidding was about to conclude by stating the following:

> Does anyone else wish to make any other **final bid** on any of the components or configuration of components at this time? Seeing none and hearing none, we will conclude the auction portion. The—under the due procedures, the debtors will consult with Amegy Bank and the committee, and then we will come back on the record and announce the successful bid or bids and the backup bid or bids.

[Debtor's Ex. No. 8, p. 46] (emphasis added).

Subsequent to this statement, and once again pursuant to the Bid Procedures, the Debtors consulted with Amegy Bank and the Committee and confirmed that the ITC bid of $20.5 million was the successful bid and the Vopak bid of $20.3 million was the backup bid.   Indeed, Ripley went back on the record and made the following statement: "After consulting with Amegy Bank and the creditors' committee, the debtors have decided we will announce on the record that with respect to land, the ITC bid on the terms and conditions stated in the record at $20.5 million is the successful bid." [Debtor's Ex. No. 8, p. 47].

The parties thereafter departed K & S's offices without rancor, confusion, or complaint. The Debtors then proceeded to take the next step required by the Bid Procedures Order.

6

**B.      The June 18 Filing of the Notice of Auction Results**

The Bid Procedures Order, in relevant part, states the following with respect to the Notice

of Auction Results to be filed with this Court:

> Provided that the Auction has closed, by no later than noon on June 18, 2010, the
> Debtors shall file with the Court a notice of the results of the action disclosing (I) the
> Successful Bid, (ii) the Successful Bidder, (iii) the Backup Bid, (iv) the final APAs
> sought for approval at the Sale Hearing; and (v) the proposed sale order.

[Docket No. 356, p. 3].

There is no question that the auction closed at approximately 9:32 p.m. on June 16,

2010—which means that it closed "by no later than noon on June 18, 2010 " as required by the Bid

Procedures. And, there is also no question that after the auction was concluded on June 16, 2010,

the Debtors, on June 18, 2010,  took the action required by the Bid Procedures Order: they filed the

Notice of Auction Results, which contained the information required by the Bid Procedures Order.

Additionally, there was no ambiguity in the Notice. It sets forth that ITC was the successful bidder

at the auction for the Property in the amount of $20.5 million and that there would be a hearing on

June 23, 2010 to seek this Court's approval of the sale of the Property to ITC. [Docket. No. 405, p.

1–2]. There was no indication anywhere in the Notice that any additional offers could thereafter be

submitted in an effort to persuade the Debtors to reject ITC's $20.5 million offer. Indeed, there could

not have been any such indication, as neither the Bid Procedures nor the Bid Procedures Order

contemplated such action.

**C.      Actions Taken by ITC Following the June 16 Auction**

The Debtor—in filing the Notice of Auction Results—was not the only party to take action

after the auction concluded on the evening of June 16, 2010. After the auction, ITC, pursuant to the

Bid Procedures and the Bid Procedures Order and in reliance on the results of the auction, posted a $2,050,000 good faith deposit, which represented ten percent of the final and highest bid made at the auction. [June 23, 2010 Tr. 139:23]. Second, ITC began the process of obtaining environmental insurance, as well as obtaining any financing necessary to have sufficient funds on hand to purchase the Property. [June 23, 2010 Tr. 139:24–25]. Third, ITC obtained board approval through a meeting of its Board of Managers (similar to a board of directors) in Houston—which required board members to fly in from out of town. [June 23, 2010 Tr. 140:1–4]. ITC took these actions because it rightfully assumed that the auction was final upon its completion on the evening of June 16. [June 23, 2010 Tr. 147:12–21]. That was the plain meaning of the Bid Procedures and the Bid Procedures Order. *See United States v. Ron Pair*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.").

D.     **The June 22 Higher Bid from Vopak**

On June 22, 2010—one day before the scheduled hearing on the motion to sell the Property—Vopak filed a pleading entitled "Statement by Vopak to Notice of Final Bids and Approval and Closing of the Sale of Debtors' Assets with Intention to Tender Further Sealed Bid" (the Statement). [Docket No. 423]. In the Statement, Vopak indicated that at the hearing to be held on June 23, 2010 on the motion to sell, Vopak intended to tender a sealed bid, which would be "a higher and better offer" than the last bid of $20.5 million made by ITC at the June 16 auction. [Docket No. 423, ¶ 10].

E.     **The June 23 Sale Hearing**

The Bid Procedures, which were attached to the Bid Procedures Order, also contained

8

the following pertinent paragraph regarding the hearing to be held on the June 23, 2010:

> On or before June 23, 2010, as further described below, in the Motion, and in the order approving the Bid Procedures . . . the Bankruptcy Court shall conduct a hearing at which the Debtors shall seek entry of an order . . . authorizing and approving the sale of the Assets to the entity/entities submitting the highest and best bid for the Assets that the Debtors, in their discretion, and after consultation with Amegy Bank National Association . . . and the Creditors' Committee . . . determine to have made the highest, best or otherwise superior offer.

[Docket No. 356, p. 11].[6]

The Bid Procedures Order, in relevant part, states the following with respect to the hearing

to be held on June 23, 2010:

> A hearing to approve the final Sale(s) (the "<u>Sale Hearing</u>") will be held at 10:00 a.m. on June 23, 2010, in Courtroom 600, 515 Rusk, Houston, TX 77002. The Debtors will seek the entry of an order of this Court at the Sale hearing approving and authorizing the Sale(s) to the highest or best offer(s) pursuant to the Bid Procedures. The Sale Hearing may not be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the Sale Hearing.

[Docket No. 356, p. 3].

The Bid Procedures Order also provides the following information relating to June 23

hearing:

> The Debtors shall sell the Assets to the Successful Bidder(s) upon the approval of the Successful Bid(s) by the Bankruptcy Court. The Debtors' presentation of a particular Qualified Bid (including, the Successful Bid(s)) to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the applicable Bid(s). **The Debtors will be deemed to have accepted a Bid(s) only when the Bid(s) has been approved by the Bankruptcy Court at the Sale hearing.**

[Docket No. 356, p. 18] (emphasis added).

---

[6] The reference to "Assets" refers to not only the Property, but also other assets owned by the Debtors which were sold to parties other than ITC.

On June 23, 2010, this Court held a hearing, as required by the Bid Procedures and the Bid Procedures Order, on whether to approve the sale of the Property to ITC for $20.5 million. At this hearing, Vopak's attorney informed the Court that Vopak's representative had brought a sealed bid to the courtroom which was a higher bid than ITC's bid of $20.5 million. Vopak's attorney represented that the sealed bid was for the amount of $21.0 million—*i.e.*, $500,000.00 more than ITC's bid. [June 26, 2010 Tr. 36:2–4]. Indeed, counsel for Vopak stated that "[o]ur view is that we should conduct this final round of bidding. If the Court should approve it, in open court before the Court with only money terms, only money being auctioned, no different terms on the asset purchase agreements, and if other bidders wish to come and bid only on the money terms and not on any variation of the asset purchase agreements, that they be welcome to bid." [June 23, 2010 Tr. 29:2–9].

After Vopak's counsel requested the Court to allow the bidding to be reopened so that his client could submit its $21.0 million bid, counsel for other parties-in-interest made arguments as to why the auction should be reopened to allow for the higher bid. Not surprisingly, ITC's counsel was the only voice opposing the reopening. The Court proceeded to hold the hearing on the motion to sell the Property to ITC, during which testimony was allowed regarding Vopak's willingness to bid $21.0 million if the Court would reopen the bidding. Testimony was adduced from three witnesses: (1) the director of business development for Vopak; (2) ITC's Chief Financial Officer; and (3) the Debtors' Chief Restructuring Officer.

At the close of the hearing, this Court orally denied the request to reopen the bidding and approved the sale to ITC for $20.5 million. Soon thereafter, the order denying the request to reopen the bidding and approving the sale to ITC was entered on the docket. [Docket No. 428]. Due to the

importance of auctions in the bankruptcy process, the Court now memorializes its ruling in this Memorandum Opinion.[7]

### III. CONCLUSIONS OF LAW

**A.      Jurisdiction and Venue**

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (N). Additionally, this proceeding is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") *De Montaigu v. Ginther (In re Ginther Trusts)* Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Venue is proper pursuant to 28 U.S.C. § 1408(1).

**B.      A Review of Circuit Case Law on Reopening Auctions Leads this Court to Conclude that it May Not Reopen the Auction that was Conducted on June 16, 2010.**

There are numerous cases addressing judicially-ordered auctions where courts have allowed the auctions to be reopened. This Court will discuss several of these cases—all from circuit courts—to explain why, in the case at bar, it will <u>not</u> reopen the bidding.

---

[7] Neither Vopak nor any other party who supported reopening the bid process appealed this Court's order approving the sale to ITC for $20.5 million. The sale to ITC has been effectuated, and the plan of reorganization has been confirmed.

1.    *First National Bank v. M/V Lightning Power*

As this Court is a bankruptcy court within the Fifth Circuit, it begins with Fifth Circuit case law. There are no cases from the Fifth Circuit regarding reopening auctions in a bankruptcy context, but there is one case that merits review. This opinion concerns an auction that was reopened in a maritime dispute.

In *First National Bank*, the bank obtained an order from the district court to sell a mortgaged vessel at a public auction. *First Nat'l Bank v. M/V Lightning Power*, 776 F.2d 1258, 1259 (5th Cir. 1985). The opposing party was unable to bid because it did not have the required documentation of its ability to pay, allowing the bank to bid $5,000.00 for a vessel valued at $900,000.00. *Id.* The Fifth Circuit has repeatedly noted that "[a]bsent fraud or collusion, a bid at a judicial sale should not ordinarily be rejected . . . but 'the court has power to do so if the price is so grossly inadequate as to shock the conscience.'" *Id.* (quoting *Jefferson Bank & Trust Co. v. Van Niman*, 722 F.2d 251, 252 (5th Cir. 1984)). Based upon the unfair circumstances in *First National* and the grossly inadequate bid price in that case (the value of the asset was 180 times more than the final bid price), the Fifth Circuit invalidated the sale. *Id.* In voiding the sale, the Fifth Circuit noted the following: "Auctions should not be empty exercises. The public policy of inspiring confidence in court-ordered sales favors confirmation of the sale to the highest bidder at the auction if it is fairly conducted. The court must also consider, however, the purpose of the judicial sale, which is to benefit both creditors and debtors." *Id.* at 1261.

This Court concludes that *First National* is distinguishable from the case at bar. In *First National*, a party was unable to bid to its full potential at the scheduled auction. Such was not true in the case at bar. To the contrary, the bidding was robust amongst three different parties spanning

an entire day of bidding. Indeed, counsel for the Debtors stated on the record that "[t]he sale of the 180 acres provided the most vigorous bidding at the auction . . . the bidding went well into the evening." [June 23, 2010 Tr. 22:7–10]. The two losing parties had an opportunity to bid further on the day of the auction, but instead chose to let the auction close. Indeed, counsel for Vopak, when questioned by the Court as to whether Vopak was prepared to adduce testimony that the auction did not comply with the Bid Procedures and the Bid Procedures Order, responded that: "[n]o, we're not challenging the actual auction process." [July 23, 2010 Tr. 30:13–14].

Additionally, in *First National*, the final bid price at the auction was woefully below the appraised value of the vessel that was auctioned off. In the case at bar, however, ITC's final bid of $20.5 million was certainly adequate given that: (a) all of the participants had ample time to conduct their due diligence prior to the auction; and (b) the auction lasted almost twelve hours, with the initial bid being approximately $7.8 million and the final bid—after fifty-five bids were made among the bidding parties—being $20.5 million.

Accordingly, for these reasons, *First National* is easily distinguishable, and this Court may not rely upon it to reopen the auction in the case at bar.

2.      *In re Gil-Bern Industries, Inc.*

This Court finds *In re Gil-Bern Industries, Inc.* particularly instructive given the facts in the case at bar. 526 F.2d 627 (1st Cir. 1975). In *Gil-Bern*, the bankruptcy court held a confirmation hearing to confirm the sale of property to the highest bidder at an auction held prior to the confirmation hearing. *Id.* at 628. At the hearing, however, the losing bidder sought to reopen bidding with a higher offer. *Id.* The bankruptcy court reopened the bidding and three new bids were made, with the original successful bidder prevailing at the auction but at a higher price. *Id.* The winning

13

bidder appealed the bankruptcy court's decision to reopen the bidding, but the district court affirmed the bankruptcy court's decision. *Id.* The First Circuit disagreed with both the bankruptcy court and the district court.

The First Circuit concluded that a bankruptcy court abuses its discretion when, after a properly conducted auction has already been held, it reopens the bidding process and approves a late bid "merely because a slightly higher offer has been received after the bidding is closed." *Id.* at 629 (citing *In re Stanley Eng'r Corp.*, 164 F.2d 316, 319–20 (3d. Cir. 1947)). Indeed, the First Circuit noted that "it is important that the bidder receive what he had reason to expect, and that nothing impair public confidence in the regularity of judicial sales." *Id.* at 628. The Court explained further:

> It might not only be thought improper for a bankruptcy court to proceed in an irregular fashion merely to gain a few extra dollars in one case, but in the long run such a practice would be penny wise and pound foolish. Creditors in general would suffer if unpredictability discouraged bidders altogether. At the least such practices might encourage low formal bids.

*Id.* at 629 (citing *In re Stanley Eng'r Corp.*, 164 F.2d at 319)).

The facts in *Gil-Bern* are very similar to the facts in the case at bar. In both instances, the auctions were fairly conducted. In this case, those parties requesting that this Court reopen the bidding attempted to distinguish *Gil-Bern* by arguing that Vopak's late bid, which was $500,000.00 higher than ITC's last bid  at the auction, was more than a "slightly higher offer." This Court disagrees. ITC's final bid at the auction was $20.5 million. $500,000.00 is a mere 2.4% of $20.5 million, and this Court concludes that 2.4% constitutes no more than a "slightly higher offer."

Accordingly, unless holdings from other circuits are more persuasive than *Gil-Bern*, this Court believes that *Gil-Bern* should apply in the case at bar.

14

3.    *In re Financial News Network, Inc.*

*In re Financial News Network, Inc.* is a Second Circuit case in which the court affirmed the district court's ruling allowing the bankruptcy court to reopen the auction for a higher bid. 980 F.2d 165, 170 (2d Cir. 1992). Unlike the case at bar, the court in *Financial News* dealt with multiple auctions, dollar amounts in the hundreds of millions, and  bidding procedures that were both complex and convoluted. *Id.* at 166–69. The Second Circuit distinguished *Financial News* from *Gil-Bern,* noting that in *Financial News*, the record presented a far more complicated bidding scheme than *Gil-Bern*. *Id.* at 170. Moreover, "[n]o clear winner emerged" from the final auction. *Id.* at 170.

In the case at bar, *Financial News* applies insofar as it indicates that the correct standard that this Court should follow is the *Gil-Bern* standard. Specifically, if an auction occurs with relatively simple offers from rival bidders in which one party comes out the obvious winner, the losing party should not be allowed to return after the auction has closed in order to overbid. To do so would be a "penny wise and pound foolish" process. *Id.* at 170. Indeed, unlike the bidding in *Financial News*, the bidding procedures here were not complicated. Moreover, a clear winner—*i.e.*, ITC—emerged from the auction as the party which had clearly made the highest bid for the Property. As such, the rule set out in in *Gil-Bern* applies to the case at bar, not the approach adopted by the court in *Financial News*.

4.    *Four B. Corp. v. Food Barn Stores (In re Food Barn Stores)*

In *Food Barn Stores*, the Eighth Circuit affirmed the Eighth Circuit BAP's decision to reopen bidding to consider and accept higher offers. *Four B. Corp v. Food Barn Stores (In re Food Barn Stores)*, 107 F.3d 558, 568 (8th Cir. 1997). The Eighth Circuit placed substantial emphasis on what is in the best interest of the estate when deciding whether to reopen bidding in a properly conducted

15

auction. *See id.* at 564–65. Additionally, in minimizing the importance of "notions of finality and regularity in judicial auctions," the Eighth Circuit noted that a bidder's reasonable expectations as to the certainty of the auction should govern. *Id.* at 565 (citing *In re Fin. News Network, Inc.*, 980 F.2d at 170).

This Court disagrees with the Eighth Circuit's non-binding precedent on both points. First, this Court takes issue with the Eighth Circuit's decision to focus on what is in the best interest of the estate without giving sufficient deference to preserving the integrity of the judicial process. The Eighth Circuit seems to be suggesting that it is entirely acceptable to "re-trade the deal" (*i.e.*, reopen the auction) if more funds would be generated for the estate. This Court cannot accept such a craw-fishing approach. Instead, this Court concludes that, when an auction is conducted in a manner that is beyond reproach and the bidding procedures are both simple and clear, the integrity of the judicial system should take precedence over ensuring more dollars to the estate by allowing a late bid that is a higher offer. This Court is aware that the Second Circuit, in justifying the reopening of bidding, held that "the Bankruptcy Judge must not be shackled with unnecessarily rigid rule." *In re Fin. News Network, Inc.*, 980 F.2d at 169 (2d. Cir. 1992) (quoting *In re Lionel Corp.*, 772 F.2d 1063, 1069 (2d. Cir. 1983)). However, this Court believes that the Second Circuit's admonition to bankruptcy courts should apply only when there has been an irregularity in the auction process or some other circumstance relating to the auction process has occurred such that, as a matter of equity, the auction should be reopened. None of these circumstances are present in the case at bar.

Second, this Court rejects the notion that it should take into account the expectations of the parties, for the plain meaning of the Bid Procedures and the Bid Procedures Order unambiguously prohibits bids after the auction has closed. *See Ghidoni v. Thomas (In re Ghidoni)*, 99 Fed. App'x

16

517, 520 (5th Cir. 2004) ("Under the basic rules of contract interpretation, the four corners of the contract control unless the contract is deemed ambiguous") (internal footnotes and citations omitted); *Nat'l Benevolent Ass'n of the Christian Church v. Weil, Gotshal & Manges, LLP (In re Nat'l Benevolent Ass'n of the Christian Church)*, 333 Fed. App'x 822, 826 (5th Cir. 2009) (noting a bankruptcy court has the authority to interpret its own orders). If there is no ambiguity, then it is black-letter law that no evidence of the parties' expectations is allowed to be introduced. *Guardian Life Ins. Co. v. Kinder*, 663 F. Supp. 2d 544, 559 (S.D. Tex. 2009).[8] Thus, in the case at bar, because the Bid Procedures and the Bid Procedures Order are unambiguous, this Court will not consider the parties' expectations.

Even if this Court were to factor in the expectations of the parties in the case at bar, it would deny Vopak's request to reopen the bidding. At the hearing, Vopak's counsel stated that "I would submit that that approach [*i.e.*, reopening the bidding to allow late bids] is also fair to each because it doesn't frustrate the expectations of the parties in the least. It simply is a matter of coming in with your highest and best serious offer at the moment in time when the Court needs to make the decision." [July 23, 2010 Tr. 34:3–7]. This Court profoundly disagrees that reopening the bid process does not frustrate the expectations of ITC. That company spent approximately twelve hours on June 16 at the scheduled auction making several bids and being declared the "Successful Bidder" by Ripley late in the evening. Over the next few days after the auction, ITC took actions to prepare for the June 23 hearing to show that it was a ready, willing, and able purchaser. To reopen the bidding process would thoroughly undermine ITC's expectations and would require ITC, at a minimum, to

---

[8] To the extent that *Gil-Bern* holds that a Court should take into account the expectations of the parties in a context where the bid procedures are clear, this Court disagrees with that portion of *Gil-Bern's* holding.

obtain new approval from ITC's Board of Managers. [June 23, 2010 Tr. 142:7–10]. ITC rightfully assumed that the auction was final upon its completion. [June 23, 2010 Tr. 147:12–21].

5. *Corporate Assets, Inc. v. Paloian*

In *Paloian*, the Seventh Circuit affirmed the district court and allowed the court to reopen bidding when: (1) the bid procedures contained an explicit modifications provision indicating that the debtor had broad discretion relating to the acceptance of the winning bid;[9] (2) the bankruptcy court found that the playing field was not level; (3) the debtor's counsel did not accept the high bid at the close of the auction and did not declare a formal winner; and (4) the rival bidder overbid by approximately nine percent. *Corporate Assets, Inc. v. Paloian*. 368 F.3d 761, 763–64, 770–72 (7th Cir. 2004).

In affirming the decision to reopen bidding, the Seventh Circuit noted that cases fall along a continuum which, depending on the factual nature of the case, gives the bankruptcy court very wide discretion or very narrow discretion. *See id.* at 768. None of the factors listed by the Seventh Circuit as factors favoring reopening the bidding are present in the case at bar. Thus, the rule from *Gil-Bern* maintains its vitality: an unimpeachably-conducted auction based on clear procedures may not be reopened solely for the reason of a higher bid after the close of the auction. If anything, *Gil-Bern's*

---

[9] The modifications provision from *Paloian* reads as follows:

Goss [*i.e.*, the Debtor] may (a) determine, with the agreement of representatives of the [pre- and post-petition] Lenders and the Committee [of unsecured creditors], which Qualified Bid(s), if any, is the highest or otherwise best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (I) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the bidding procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of Goss, its estate[], and its creditors. At or before the Sale Hearing, Goss may impose such other terms and conditions as it may determine to be in the best interests of Goss' estate, its creditors and other parties in interest.

*Id.* at 763–64.

holding is in harmony with the Seventh Circuit's holding. Indeed, this Court would conclude that, on the spectrum approach promulgated by the Seventh Circuit, the facts in the case at bar would give this Court no discretion to reopen bidding.

In sum, after reviewing all of these circuit court cases, this Court finds that *Gil-Bern* is persuasive and applicable in the case at bar. To reopen the bidding process to allow Vopak to make its late bid would be an abuse of this Court's discretion. Accordingly, this Court will not reopen bidding.

**C.    Other Arguments Made by the Parties Seeking to Reopen the Bidding Process are not Sufficiently Convincing**

1.    *Certain Language in the Bid Procedures Expressly Allows the Bidding Process to be Reopened.*

In the case at bar, the Bid Procedures provide that all bidding shall be done at the June 16 auction and that the successful bid and bidder would be announced immediately upon the conclusion of the auction. Indeed, in a section entitled "Closing the Auction," the Bid Procedures state:

> Upon conclusion of the bidding, the Auction shall be **closed**, and the Debtors, after consultation with Amegy and the Creditors' Committee, shall immediately (I) review each Qualified Bid on the basis of the Bid Assessment Criteria and the financial and contractual terms and the factors affecting the speed and certainty of consummating the Proposed Sale; and (ii) upon such review, the Debtors shall immediately identify the highest, best, financial or otherwise superior offer for the Assets . . . and advise the Qualified Bidders of such determination.

[Docket No. 356, p. 18] (emphasis added).

The Bid Procedures further provide that "by no later than noon on June 18, 2010, the Debtors shall file with the Court a notice of the results of the auction disclosing (I) the Successful Bid, (ii) the Successful Bidder, (iii) the Backup Bid, (iv) the final APAs sought for approval at the Sale Hearing, and (v) the proposed sale order." [Docket No. 356, ¶ 8]. This, the Debtors did. As

19

such, not only did the Bid Procedures' description of the auction's closing indicate that the auction was final, but the Debtors' actions subsequent to the auction did as well.

Despite this language, Vopak argues that the following language in the Bid Procedures indicates that further bidding could take place at the June 23 hearing on the Debtors' motion to approve the sale:

> The Debtors shall sell the Assets to the Successful Bidder(s) upon the approval of the Successful Bid(s) by the Bankruptcy Court. The Debtors' presentation of a particular Qualified Bid (including, the Successful Bid(s)) to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the applicable Bid(s). **The Debtors will be deemed to have accepted a Bid(s) only when the Bid(s) has been approved by the Bankruptcy Court at the Sale Hearing.**

[Docket No. 356, p. 18] (emphasis added).

According to Vopak, the emphasized language above expressly—or, at least, impliedly— allows the auction to be reopened because the sentence puts all parties on notice that until this Court actually approves whatever bid the Debtor brings to Court (which, in this case, is ITC's $20.5 million bid), the bidding process remains open.

"[I]t is the province of this Court . . . to interpret its orders," including the Bid Procedures. *In re Sherrill*, 78 B.R. 804, 806 n.2 (Bankr W.D. Tex. 1987); *see also Nat'l Benevolent Ass'n*, 333 Fed. App'x at 826 ("A final decree closing the case after the estate is fully administered does not deprive the court of jurisdiction to enforce or interpret its own orders."); *In re Dorado Beckville Partners I, L.P.*, No. 08-31796, 2008 Bankr. LEXIS 1988, at *4–5 (Bankr. N.D. Tex. July 11, 2008) (holding that the bankruptcy court retained jurisdiction to interpret and enforce the bid procedures).

This Court does not interpret that specific section of the Bid Procedures to mean that further bidding could take place at the hearing to approve the sale. Rather, this provision gave this Court the

ability to disapprove the proposed sale to the highest bidder from the June 16 auction where some improriety has come to light after the auction. Stated differently, the Bid Procedures expressly set forth that this Court has the power to ensure that the auction was properly conducted. As such, this Court disagrees with Vopak's interpretation of the Bid Procedures. If the Bid Procedures did in fact contain language to the effect that after the auction of June 16 was completed, more bids could nevertheless be made at the June 23 hearing, then this Court would accept Vopak's argument and allow Vopak to submit its higher bid. The Bid Procedures, however, simply do not contain any such language.

2.    *The Stalking Horse Argument*

An argument made by the Debtor in support of reopening the bids concerns the absence of a stalking horse. The argument is as follows: (a) ITC could have entered into a stalking horse agreement with the Debtor; (b) by entering into such an agreement, ITC could have protected itself by knowing, prior to the beginning of the June 16 auction, that if its final offer was topped by some other party at the sale hearing, then ITC would nevertheless have received some amount of monetary compensation to make it whole for the costs that it incurred in participating in the process; and (c) by not entering into such an agreement, despite the Debtor's best efforts to persuade ITC to do so, ITC ran "the risk of being a disappointed bidder" [June 23, 2010 Tr. 73:18]—*i.e.*, ITC ran the risk of some other party (here, Vopak) making a higher offer at the June 23 hearing.

The weakness in this argument is that ITC did, in fact, protect itself. It did so by reviewing the Bid Procedures and the Bid Procedures Order prior to the June 16 auction, adhering to the plain terms of those documents (including making the highest bid at the auction), and then taking the steps necessary after the auction to prepare for the June 23 hearing. ITC should not now be punished for

21

complying with the Bid Procedures and the Bid Procedures Order. The adage that "no good deed goes unpunished" will not stand in this case.

3.  *The Asset Purchase Agreement Argument*

An argument made by Vopak in support of reopening the Bid Process concerns a change in the Asset Purchase Agreement (the APA) made by one of ITC's lawyers. In the initial version of the APA, section 12.1(f) sets forth that the APA may be terminated at any time prior to closing "by Sellers, if (I) Sellers execute one or more definitive agreements with a Third Party for the acquisition of all or substantially all the Purchased Assets, and, (ii) the Bankruptcy Court enters a Final Order in the Bankruptcy Case approving such definitive agreement(s)." [Debtor's Ex. No. 7, p 24].

In the most recent version of the APA, however, section 12.1(f) sets forth that the APA may be terminated at any time prior to closing "by Sellers, **or Purchaser**, if (I) Sellers execute one or more definitive agreements with a Third Party for the acquisition of all or substantially all the Purchased Assets, and, (ii) the Bankruptcy Court enters a Final Order in the Bankruptcy Case approving such definitive agreement(s)." [Debtor's Ex. No. 18, p 33].

According to Vopak, the insertion of the phrase "or Purchaser" by ITC's attorney—a change that was made prior to the auction held on June 16, 2010—underscores that ITC went to the auction on June 16 knowing full well that the Debtors (*i.e.*, the Sellers under the APA) might well sell the Property to someone other than ITC at any time prior to this Court entering a final sale order. Otherwise, so Vopak argues, why would ITC have included the phrase "or Purchaser" in that portion of the APA concerning when the parties could terminate the contract?

The Court rejects this argument. The addition of the phrase "or Purchaser" does not suggest that the bidding can be reopened nor that ITC, prior to the June 16 auction, knew that bidding could

resume at the June 23 sale hearing. Rather, this additional language ensures that if the Debtor brings ITC's bid to Court for approval, and the Court decides not to approve the sale, ITC can unilaterally terminate the APA if the Debtor subsequently brings a different bid from another party to the Court for approval. In sum, the fact that ITC's lawyer added the phrase "or Purchaser" to the draft APA was nothing more than careful lawyering to protect ITC in the event this Court did not approve the proposed sale to ITC.

4.     *The New Information Argument*

Another argument advanced by Vopak as to why the bidding process should be reopened concerns new information about the Property. According to the testimony of Vopak's vice-president, subsequent to the auction, a representative of Vopak toured the Property and discovered that because the Debtors already had a required permit in place, the time it would take Vopak to achieve that same permit would be shortened. [June 23, 2010 Tr. 114:11–24]. Therefore, Vopak, with this new information, concluded that it would be willing to bid more than $20.5 million for the Property. The weakness in this argument, however, is that nothing prevented Vopak from discovering this information prior to the auction. Indeed, Vopak's representative testified that Vopak had performed extensive due diligence prior to the auction, and he failed to explain why Vopak was unable to discover this particular information at that time. [June 23, 2010 Tr. 115:1–116:15]. Under these circumstances, this Court is unwilling to reopen the auction.

5.     *Late Bids are, as a Matter of Course in the Bankruptcy Practice, Acceptable*

At the June 23 hearing, counsel for the Debtors, made a very apt and telling comment: "Late bids are part of our business. We, chapter 11 lawyers, may feel a little uncomfortable with them, we may not be able to pigeon-hole them within exact provisions of bid procedures, but the inevitable

fact of life is that late bids are part of our business." [June 23, 2010 Tr. 72:4–8]. Counsel for the Debtor made this statement in an effort to convince the Court that it would not be inequitable to reopen the auction and allow Vopak the opportunity to submit its higher bid. And indeed, there is little doubt that this comment was right on the mark. The culture of the Chapter 11 bankruptcy practice has developed into a world where rules are set and then broken or, if not broken, at least bent to a fair degree. *See, e.g.*, Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent in Bankruptcy*, 83 AM. BANKR. L.J 663 (2009) (noting that many norms within the bankruptcy practice have developed that undermine the legitimacy of the process). The justification for such an environment is that debtors and creditors' committees need to have maximum flexibility to "re-trade a deal" in order to generate maximum proceeds for the bankruptcy estate. And, there is certainly some logic to this approach in view of the fact that one of the primary objectives of the bankruptcy process is to pay claims as much as possible. *See Fin. Sec. Assur. v. T-H- New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 188 B.R. 799, 807 (E.D. La. 1995), *aff'd*, 116 F.3d 790 (5th Cir. 1997). Thus, so the logic goes, if reopening the auction to allow Vopak's higher bid will generate more dollars for the estate than ITC's last bid at the June 16 auction, then the auction should be reopened.

While the Court certainly appreciates the need to maximize payment of claims, the Court must also always keep one eye cocked on promoting and preserving the integrity of the judicial process. Reneging on clearly established and properly conducted procedures in order to generate some additional dollars for the estate undermines the integrity of the judicial process; indeed, it can undermine the integrity and reputations of the individual litigants and lawyers. The public in general, and all participants at auctions in particular, need to have confidence in the judicial system. A court

24

order reopening the auction process when procedures were clearly established, when the auction was conducted without fraud or collusion and in compliance with the procedures, and when an adequate bid was accepted, will undercut such confidence and faith in the system. This, the Court will not allow, even if reopening the auction would generate more proceeds for the estate. Accordingly, for these reasons, the Court will not reopen the bidding.

**D.**  **Holding Auctions in the Courtroom will Minimize the Risk of any Confusion about when Bidding will be Complete, which will Promote Integrity of the Process and also Maximize Value to the Estate**

The Court wants to emphasize that although in the case at bar, there is a clear tension between the two goals of maximizing value for the estate and preserving the integrity of the judicial process, these two objectives do not necessarily have to be at odds with one another. Auctions conducted in a certain manner can achieve both goals.

The Court believes that the most appropriate approach to maximizing value for the estate—and also the soundest method of maintaining confidence in the system—is to hold auctions in the courtroom, on the record, with the Court serving as auctioneer.[10] In this manner, all participants will know that there will be one—and only one—time when bids may be submitted. No party could reasonably conclude that the process is bifurcated, with an out-of-court auction to be held first, and then a subsequent hearing in Court with higher bids to be made. This approach will also inspire participants to prepare to make their absolute highest bid because they will know that they will not have a second chance. Thus, this method will generate maximum proceeds for the estate.

---

[10] At the hearing, Vopak's counsel noted that there is at least one bankruptcy judge who believes that holding a live auction in the courtroom, with the judge serving as the auctioneer, is an affront to the dignity of the court. [July 23, 2010 Tr. 34:18–22]. The undersigned judge does not share this view. A major objective of the bankruptcy process is to maximize the value of assets, *see In re T-H New Orleans Ltd. P'ship,* 188 B.R. at 807 (E.D. La. 1995), *aff'd,* 116 F.3d 790 (5th Cir. 1997), and if holding an auction in open court will best achieve this goal, then the undersigned judge believes that doing so is not only **not** beneath the dignity of the Court, but is in accordance with the duties of the Court.

This approach will also preserve and promote the integrity of the judicial process for at least two reasons. First, the parties, and their attorneys, will know that bids are being made under oath and that any bidder is subject to cross examination as to whether that bidder has the financial means to actually pay to the estate the amount of the bid that is being made. Second, all parties will know that the Court will sign an order at the end of the hearing approving the debtor's sale to the highest bidder. Thus, all parties will know when they depart the courtroom that the auction will be over, the sale will be approved, and the bidding process cannot be reopened.

There will no doubt be those who oppose courtroom auctions on the grounds that there are certain bidders who do not want to bid at public auctions or give testimony under oath about their financial wherewithal. Therefore, they will simply sit on the sidelines and not participate at any auction held on the record in court. These circumstances would arguably preclude the estate from maximizing the value of the assets to be sold because these nonparticipants would otherwise make bids at a private auction held off the record in amounts that would be higher than any bids made on the record in the courtroom. This Court is not convinced that such a response is a compelling argument.[11] However, even if this point of view has merit, the judicial process in general—and certainly the bankruptcy process, in particular—is better off making full disclosure on the record, where anyone can check to ensure that the auction was conducted fairly and with sworn testimony. After all, "[t]he three most important words in the bankruptcy system are: disclose, disclose,

---

[11] One need only review the docket sheet and record (including various pleadings and the transcripts of hearings and the auction) in the chapter 11 case of Texas Rangers Baseball Partners to discern the positive effect that holding an auction in the courtroom—with bids submitted on the record—can have on maximizing value for the estate and, through full disclosure, promoting public trust in the judicial system. Those parties who were interested in purchasing the Rangers team did not remain on the sidelines fearful of public scrutiny, but rather bid serious sums of money at an auction that, because it was done in the courtroom by a sitting bankruptcy judge, they knew would not be reopened at a later date to allow further bidding. *See In re Tex. Rangers Baseball Partners*, Case No. 10-43400, in the United States Bankruptcy Court for the Norther District of Texas, Ft. Worth division.

disclose." *Sanchez v. Ameriquest Mortg. Co. (In re Sanchez)*, 372 B.R. 289, 305 (Bankr. S.D. Tex. 2007).

### IV. CONCLUSION

This Court concludes that when an auction is conducted in a manner that, in all facets, was beyond reproach, it may not be reopened to allow a higher bid. To do so would be an abuse of discretion. The rationale for this rule is that, when the bid procedures are clear; the bid procedures are not complex; the parties are sophisticated; there is no collusion or fraud; and the auction price is not grossly inadequate—the highest priority should be placed on maintaining the integrity of the system. In the case at bar, the procedures were clear and fair; the parties were sophisticated; the auction was conducted pursuant to the Bid Procedures and Bid Procedures Order; and the price was adequate

Therefore, this Court believes that it would be abusing its discretion if it reopened the auction to allow Vopak to make a higher bid. It will therefore not do so.

An order has already been entered on the docket consistent with this Opinion.


Signed on this 15th day of December, 2010

Jeff Bohm
United States Bankruptcy Judge